IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 10, 2015

**MICHAEL GEORGE MEDINA v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Smith County**
**No. 99-270     John D. Wootten, Jr., Judge**

_____

**No. M2014-00561-CCA-R3-PC – Filed September 2, 2015**

_____

The Petitioner, Michael George Medina, appeals from the denial of post-conviction relief by the Criminal Court for Smith County. He was convicted of first degree murder of his wife and sentenced to life imprisonment in the Tennessee Department of Correction. On appeal, the Petitioner argues that he received ineffective assistance of counsel. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Blake Lawrence, Lebanon, Tennessee (at hearing); and Leah R. Wilson, Nashville, Tennessee (on appeal), for the Petitioner, Michael George Medina.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith DeVault, Senior Counsel; Tom P. Thompson, Jr., District Attorney General; and Jason Lawson, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The Petitioner's conviction stems from the shooting death of the victim, Jennifer Medina, on September 26, 1999, in their marital residence. After a jury trial, the Petitioner was convicted as charged of first degree murder. He was subsequently sentenced to life imprisonment. See State v. Michael George Medina, No. M2001-02412-CCA-R3-CD, 2002 WL 31188186 (Tenn. Crim. App. Oct. 2, 2002), perm. app. denied (Tenn. Jan. 27, 2003). In its opinion on direct appeal, this court summarized the evidence as follows:

On September 26, 1999, Jennifer Medina was found in the home she had shared with the [Petitioner], lying in a pool of blood with a fatal gunshot wound to the head. The autopsy report and physical evidence established that death was produced by a 9 mm gunshot wound, with the gun's barrel touching her head when the gun was fired. The [Petitioner], the estranged husband of the victim and present at the scene, was charged with the homicide.

The parties were married in 1991 and had one child, who was two years old. The child, Austin, had been diagnosed with cancer and, during this time, was undergoing chemotherapy treatments at Vanderbilt Hospital in Nashville, in addition to receiving intravenous medication at home. By 1999, the marriage had seriously deteriorated, and the [Petitioner] had filed for divorce. After the divorce was filed, the victim resided with her best friend and next-door neighbor, Ellen Newman. The [Petitioner] continued to reside in the marital residence with his minor children from a prior marriage. The parties agreed to a temporary order, which provided for shared custody of Austin. The divorce action was characterized as hostile and bitter, as were the ensuing temporary custody battles.

On August 20, 1999, an order of protection was issued against the [Petitioner], based upon a finding of domestic abuse after the [Petitioner] refused to comply with the terms of the temporary custody agreement. On this occasion, the victim was thrown against a wall by the [Petitioner] and sustained bruises and a knot on her head.

Also in August 1999, the victim contacted Crime Stoppers in Franklin, Tennessee, and reported that the [Petitioner] had stolen a "bobcat" loader in June 1997. She provided details of how the theft occurred, how the [Petitioner] had repainted it and removed the serial numbers, and to whom it was sold. The [Petitioner] was contacted by a detective, and he claimed that the victim was manufacturing the charges because he had been given custody of their child. The details provided by the victim were subsequently verified by the police, and the [Petitioner] was arrested on August 26th for the theft. The victim would have been a material witness in the case.

After the arrangements under two joint custody orders had failed, temporary custody of the minor child and child support were awarded to the victim on September 10, 1999. The order provided the [Petitioner] visitation on Monday through Thursday from 5:00 p.m. to 6:30 p.m. and

every other weekend from Friday at 5:00 p.m. to Sunday at 5:00 p.m. The [Petitioner] was permitted to retain possession of the marital residence, and the victim was responsible for delivering the child to and from the residence during the [Petitioner]'s visitation periods.

At approximately 5:00 p.m. on the day of her death, the victim left the Newman residence on foot to go and retrieve Austin from his father following visitation. It was the victim's normal practice to remain outside the residence when picking up her son. Before leaving, the victim told Ellen Newman that she would be back in five minutes. She carried no purse or bags with her.

Approximately two and one-half hours later, a 911 call was made from the marital residence. When officers responded to the call, they found the [Petitioner] outside with Austin in his arms. Upon entering the residence, deputies found the victim lying on the floor with a gunshot wound to the head. A .38 caliber revolver was found near her head and a 9mm semi-automatic handgun was found near her knee. The serial number on the .38 revolver was removed and no identifiable fingerprints were found on either weapon. The .38 caliber revolver was fully loaded and had not been fired. A 9 mm shell casing was found on the floor in the kitchen area and a 9 mm projectile was removed from the floor, where it was embedded.

The [Petitioner] was taken into custody and subsequently gave a statement to Tennessee Bureau of Investigation Agent Jason Locke. The [Petitioner] stated that the victim had brought the .38 revolver with her into the house and then refused to leave. He claimed that she wanted to talk about reconciling. The [Petitioner] also stated that he was afraid of her as she was hysterical at times. He stated that, after he saw her with the gun, he retrieved his 9 mm pistol from the safe in the bedroom. He explained that he put the gun in his back pocket so that the victim would not see it. During this period, the victim remained in the living room of the house. The [Petitioner] stated that an argument ensued and "she kept pointing the gun at me. . . . I turned around and she was right in front of me. And I couldn't see the gun any more, she was just too close to me, I didn't know where it was, and I grabbed her and I pushed her. We hit the ground, and all three of us hit together." When the victim fell, he heard a gunshot. The [Petitioner] denied shooting the victim. During the scuffle, the [Petitioner] maintained that his pistol remained in his back pocket and he offered no explanation as to how his pistol shot the victim.

-3-

Several witnesses testified that the victim did not own a gun. No one saw her entering the residence with a gun that day, including the [Petitioner]'s three sons from a prior marriage who were present outside the house when she arrived. Several witnesses also testified that the victim had no plans to reconcile with the [Petitioner]. The victim's father testified that she and Austin had in fact planned to move to Illinois and live with him after the divorce.

At trial, the State argued that the [Petitioner] had lured the victim into the residence on this date, had shot her in the head, and then planted the .38 pistol by her body. On April 12, 2001, the [Petitioner] was found guilty by a jury of first-degree premeditated murder.

Michael George Medina, 2002 WL 31188186, at *1-2 (footnotes omitted).

On direct appeal, the Petitioner argued that the evidence was insufficient to establish premeditation and that the trial court erred by forcing the Petitioner to testify before all his witnesses had taken the stand. Id. at *3-5. This court affirmed the Petitioner's conviction, and the Tennessee Supreme Court denied his application for permission to appeal on January 27, 2003.

On September 29, 2003, the Petitioner filed a timely pro se petition for post-conviction relief. He later filed an amended petition on November 2, 2006, with the assistance of his second court-appointed counsel. On October 16, 2013, the Petitioner filed a second amended petition through his fourth court-appointed counsel. The post-conviction hearing occurred on January 10, 2014. The Petitioner, trial counsel, and TBI Special Agent Jason Locke testified at the hearing.[1]

**Post-Conviction Hearing.** The Petitioner testified that he considered himself to be Hispanic. He recalled that on the day of his trial, there were 127 prospective jurors who were all Caucasian. He said that when he asked trial counsel about the lack of minorities in the jury pool, counsel responded, "[W]ell, that's what we've got and that's all we can go with[.]" He asked for a change of venue, and counsel told him that the judge would not grant the request. According to the Petitioner, trial counsel "just took

---

[1] We only address the testimony from the hearing relevant to the issues that the Petitioner raised in his appellate brief. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

-4-

control" during jury voir dire and "shut down" the Petitioner each time he asked counsel a question.

The Petitioner also faulted trial counsel for failing to file a motion to suppress his statement to TBI Agent Jason Locke. He testified that on the night of his wife's death, he was taken to the jail where he was denied his right to counsel. When he asked for an attorney, he was told that he was not in trouble. He said that Agent Locke continued to interrogate him, and he was not allowed to call anyone. The Petitioner stated that he was eventually read his Miranda rights, and he acknowledged signing a Miranda rights waiver. He agreed that most of the interview occurred after he signed the waiver. He also signed a consent to search form, though he testified that he "had no idea what [he] was signing[.]" He first spoke with trial counsel about a day after he was arrested.

The Petitioner further alleged that a sander tool was improperly introduced into evidence at trial. He said that the State used the sander to show that he removed the serial number from one of the weapons. According to the Petitioner, the sander was illegally obtained evidence because it was seized from a barn beyond the scope of the search warrant. He stated that he and trial counsel never discussed excluding the sander from evidence even though it was retrieved from his neighbor's property. He said that he was surprised when the State introduced the sander into evidence at trial.

The Petitioner testified that his divorce attorney advised him to record all conversations with his wife. He said that the tape recorder was on when his wife arrived to pick up their son on September 26, 1999. However, his wife became very angry and made him turn off the device. He stated that their prior argument was recorded on the tape. The State subsequently provided a crime scene photograph of the tape and tape recorder in discovery, but it never produced the tape itself. The Petitioner said that he discussed this issue with trial counsel, but counsel did not file any motions asking the State to produce the tape. He stated that trial counsel also abandoned all questioning of Agent Locke regarding the tape at trial.

The Petitioner said that at trial, a tape recording of his 911 call was introduced as evidence. He believed that the recording had gaps in time and content. He asserted that the timing of the tape did not "add up" and that the missing portions supported the State's theory that he had staged the crime scene. He said that the entire tape was about ten minutes long, but it should have been nineteen minutes long based on the State's assertion that he placed the 911 call at 7:41 p.m.. According to the Petitioner, trial counsel noticed that the timing was off and even questioned Agent Locke about this issue at the preliminary hearing. He said that Agent Locke responded, "[T]hat's the entire tape. It's not altered. That's just the way it's made." The Petitioner stated that the tape

recording should have been excluded at trial because there was "no telling what else was on there."

The Petitioner also testified that there was a discrepancy between diagrams of the crime scene drawn by an EMT and a TBI Special Agent and what crime scene photographs depicted. He said that although there was never a hand towel next to his wife's body, the photographs showed a towel laying beside her. He asserted that neither of the diagrams included a towel. He alleged that the State planted the towel at the scene to support their argument that he wiped the fingerprints off of the guns. At trial, the Petitioner used a hand towel to wipe the sweat from his hands. He said that during his cross-examination, the prosecutor repeatedly directed the jury's attention to the towel in his hands and the towel in the crime scene photographs. He asserted that trial counsel should have questioned the State's witnesses regarding tampering of the scene and the discrepancies. The Petitioner acknowledged that EMT Mark Manning testified at trial that the photographs were more accurate than the diagram that he drew. He also agreed that Manning stated that the diagram did not catalog everything that was present at the scene.

The Petitioner further stated that he had always denied firing a weapon. He said that he and trial counsel never discussed a defense based on the theory of self-defense. He believed that his wife's death was accidental. He said that he refused to testify that he shot the gun or that he had acted in self-defense despite trial counsel's suggestion. He was surprised when the issue of self-defense was raised in a jury instruction. The Petitioner explained that he would have to testify that the gun was in his hand if he were to claim self-defense, and he did not want to rely on this theory. He acknowledged that judges are required by law to charge jury instructions based on the facts raised in the case. He agreed that his statement and trial testimony asserted that both he and the victim were armed with guns.

The Petitioner asserted that trial counsel failed to call multiple witnesses for the defense. He said that counsel should have called TBI Special Agent Roy Copeland and Detective Danny Williams to testify regarding the processing of the crime scene and other issues such as the tape recorder and the gaps in the 911 call. He said that he expected to see Detective Williams testify at trial, and he was surprised when the witness was not there.

At the conclusion of the Petitioner's testimony, post-conviction counsel and the State stipulated that the Petitioner's previous post-conviction counsel investigated the racial composition of the venire and determined that at least 95 percent of the 127 prospective jurors were Caucasian. Counsel was unable to verify the ethnicities of the remaining jurors.

Trial counsel testified that he began representing the Petitioner after the Petitioner's divorce attorney referred him to the case. He visited the Petitioner at the Smith County Jail on the same afternoon that he received the phone call from the divorce attorney. He could not recall whether the Petitioner had been charged with murder at that point. His representation of the Petitioner lasted from that initial visit up to the motion for new trial hearing. After the motion for new trial was denied, the Public Defender's Office appealed the case. Trial counsel said that he no longer had any case files because he had given them to appellate counsel. He also did not have any contact with appellate counsel. He could not recall many specific details of the Petitioner's case because the trial was about thirteen years ago, and he had tried several murder cases since then. During trial, he did not remember the Petitioner ever expressing dissatisfaction with the defense strategy or counsel's representation.

Trial counsel said that he had been practicing law for over thirty years and that he had tried numerous cases. He said that his goal was to win in every case he tried, and his preparation was the same whether he was retained or appointed. He felt that he had done everything he could in the Petitioner's case. Counsel recalled that after the Petitioner moved from Smith County to Illinois prior to trial, he consistently sent the Petitioner letters about the status of the case as well as plea offers from the State. He said that the Petitioner returned to Tennessee "numerous times" and that they would discuss the case each time, including the trial and the evidence. It was counsel's practice to keep a trial notebook with voir dire, motions, list of exhibits, witness statements, strategies for direct and cross-examination, and notes about each witness. He would also consult with clients during trial about what they wanted him to ask the witnesses. Counsel stated that he used a trial notebook in the Petitioner's case.

Trial counsel testified that he could not recall many details about the venire or the jury voir dire. He said that he asked the Petitioner about his ethnicity during a meeting at his office. After the Petitioner responded that he was white, counsel treated him as Caucasian and was not concerned about having minorities on the jury. He agreed that the Petitioner had a darker complexion, and he recalled asking the jury pool whether they had any issue trying a case involving a brown defendant and a Caucasian victim. He specifically read his voir dire question into evidence:

> Now, the proof is going to show that Jennifer Medina was a white female. Mike Medina is of Hispanic origin. Will the fact that Mike Medina -- I'm sorry, will the fact that Mike is of Hispanic origin and brown cause you any problem in rendering a fair trial to him and rendering a fair verdict in this case? And then line 21, Jurors indicate by silence, then on

line 22, question, Anybody?  Line 23, If you've got any problem with that whatsoever, we need to know it now.  Line 25, Jurors indicate by silence.

Counsel stated that he did not believe a change of venue would have been granted because "there was no basis" for the request.  He said that based on his experience trying high profile cases, most people in the county were not aware of the news.

Regarding the Petitioner's statement to Agent Locke, trial counsel testified that "[t]here was no need to suppress the statement" because it was exculpatory.  Counsel said that the Petitioner had consistently denied any involvement in the shooting from the night of the offense to his testimony at trial.  He stated that it was a trial strategy not to pick a fight where it was not necessary.  Trial counsel said that "there was no question" that the Petitioner would testify at trial.  He stated that the purpose of the strategy was for the Petitioner "to tell his side of the story."

Trial counsel did not have any recollection regarding the search warrant or the sander that was introduced at trial.  He said that it was his usual practice to review the search warrant for its validity and to provide his clients with a copy of the warrant.

Trial counsel said he asked the Petitioner for input regarding the witnesses prior to trial, and they discussed which witnesses might testify and what they would say.  He stated that he traveled to Smith County multiple times to interview people.  He investigated the Petitioner's divorce file as well as the separate theft charge in Williamson County.  He said that he "talked to a lot of people" and he thought he had interviewed and subpoenaed every witness that the Petitioner wanted.  Counsel stated that he based his decision of whether or not to call witnesses on trial strategy because the testimony of a prospective witness may be more harmful than helpful.  When asked why he did not subpoena the police and question them about the lack of fingerprints on the gun, counsel responded that "[n]othing good can come of that . . . because they'll say, well, you wiped them off or you destroyed them or something."  During trial, counsel checked off every witness listed in his trial notebook that was called by the State or the defense.  He said that the Petitioner was aware of the witness list, and he did not recall the Petitioner raising any issues or complaints about the witnesses.

With regard to the 911 tape, trial counsel stated that he listened to the recording numerous times.  He could not recall any gaps in the tape.  Trial counsel further testified that he had no recollection of the discrepancy of a towel that was depicted in photographs but not in drawings of the crime scene.  According to counsel, the Petitioner's case did not involve self-defense "but it was similar enough to a self-defense case where he has to take the stand and tell what happened[.]"

After the close of the Petitioner's proof, the State introduced multiple official documents into evidence dating from before the Petitioner's trial in which the Petitioner asserted that his race was "Caucasian" or "White." The exhibits included the Petitioner's 1997 Wilson County divorce filings, his 1999 Smith County divorce filings, his application for a handgun permit with the Department of Safety, and multiple applications for a driver's license.

The State also called TBI Special Agent Jason Locke. Agent Locke testified that he was the lead investigator in this case. He met with the Petitioner on the night of the victim's death and first obtained written consent to search the crime scene. Next, Agent Locke went over the Miranda waiver form with the Petitioner, and he began to take an initial statement after the form was signed. According to Agent Locke's report of the first interview, the consent to search form was signed at 9:54 p.m. and the Miranda waiver was signed at 10:05 p.m. The Petitioner's interview began at 10:05 p.m. and lasted a total of one hour and thirty-five minutes. Agent Locke said that the Petitioner was "very cooperative" and readily provided information. He stated that the Petitioner never asked for a lawyer.

Agent Locke stated that during the interview, the Petitioner discussed his marital issues with the victim and that he had recorded some conversations. However, the Petitioner did not mention recording any conversations on the night of the shooting. Regarding the processing of the crime scene that night, Agent Locke noted that the tape recorder was photographed but not collected as evidence, which indicated that there was nothing of evidentiary value in the item. Agent Locke confirmed that law enforcement never seized a tape recorder or a cassette tape as evidence after executing the search warrant in October 1999.

Agent Locke said that he was present during the execution of the search warrant at the Petitioner's property. A copy of the search warrant and a list of recovered items were introduced into evidence. The warrant reflected that law enforcement sought to find, among other things, evidence of "metal, files, grinders, or other tools which could be used to remove serial numbers from metal objects[.]" Agent Locke said that he recovered a Milwaukee heavy duty sander as a result of the search.

Agent Locke testified that he had twenty-six years of experience in law enforcement and that he had listened to many 911 calls. He explained that it was common for 911 recordings "to have many starts and stops and intermittent pauses" because the calls are recorded on separate tracks, and there are often many things occurring simultaneously. For instance, an operator may have a caller on the line while also dispatching law enforcement at the same time, and both tracks are recorded through

two separate systems. Meanwhile, another 911 call may come into the call center, and it is also recorded.

At the conclusion of the hearing, the post-conviction court made oral findings of fact and conclusions of law and denied relief on all claims. The court specifically found that the Petitioner failed to carry his burden of proof in demonstrating prejudice with regard to his claims. On February 12, 2014, the court entered a written order denying post-conviction relief.[2] The Petitioner filed a timely notice of appeal.

## ANALYSIS

On appeal, the Petitioner argues that the post-conviction court erred in denying his petition for relief because trial counsel rendered ineffective assistance of counsel. Specifically, the Petitioner contends that trial counsel was ineffective because counsel failed to: (1) challenge the racial composition of the jury venire or request a change of venue; (2) file a motion to suppress his statement to Agent Locke; (3) challenge the admission of the sander; (4) subpoena certain witnesses; (5) seek to introduce the tape recorder as evidence at trial; (6) address the discrepancy between the towel depicted in the crime scene photographs and the lack of a towel in the diagrams; (7) object to the gaps in the 911 recording; and (8) oppose the trial court's self-defense jury instruction. The State responds that the post-conviction court properly denied relief because the Petitioner failed to establish that he received ineffective assistance of counsel. We agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or

---

[2] In its order, the post-conviction court offered a detailed explanation of the unusual procedural posture in the Petitioner's case resulting in a nearly thirteen-year delay from the conviction in April 2001 to the post-conviction hearing in January 2014. Specifically, the court found that "all delays primarily lay with the [P]etitioner due to his numerous pro se filings, his personal conflicts with his multiple attorneys, and his unusual and extraordinary applications for relief with other courts of record and the appellate courts of this State."

fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal citations and quotation marks omitted); see Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal quotation marks and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Vaughn, 202 S.W.3d at 116 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975); Strickland v. Washington, 466 U.S. 668, 687 (1984)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional

-11-

errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).

"In evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. However, this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

As a preliminary matter, we note that although post-conviction counsel requested that a copy of the trial record be included in the record on appeal, it was not included. Because our review of the trial was necessary to determine whether the Petitioner was entitled to post-conviction relief, we have taken judicial notice of the record from the Petitioner's direct appeal. See State ex rel. Wilkerson v. Bomar, 376 S.W.2d 451, 453 (Tenn. 1964) (concluding that this court may take judicial notice of the direct appeal record).

**I. Jury Venire.** First, the Petitioner contends that trial counsel was ineffective for failing to object to the racial composition of the venire and for failing to request a change of venue. Specifically, the Petitioner complains that he is a Hispanic male who was charged with the homicide of a Caucasian female, and he was convicted by a biased jury. He argues that the outcome of trial could have been different if minorities had been included in the jury pool. The State responds that the Petitioner failed to establish a basis for a change of venue or that he was prejudiced during jury selection.

Both the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a defendant the right to a trial by an impartial jury. "'The ultimate goal of voir dire is to ensure that jurors are competent, unbiased and impartial.'" Smith v. State, 357 S.W.3d 322, 347 (Tenn. 2011) (quoting State v. Hugueley, 185 S.W.3d 356, app. 390 (Tenn. 2006)). There is no constitutional guarantee requiring a person to be tried by a jury composed in whole or in part of his or her own race. Harvey v. State, 749 S.W.2d 478, 481 (Tenn. Crim. App. 1987) (the mere fact that African-American petitioner was tried by twelve Caucasian jurors did not violate any right); see also Wheeler v. State, 539 S.W.2d 812, 815 (Tenn. Crim. App. 1976)). To establish an improper jury venire, a defendant must demonstrate:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

State v. Hester, 324 S.W.3d 1, 39 (Tenn. 2010) (quoting Duren v. Missouri, 439 U.S. 357, 364 (1979)).  A petitioner will not prevail on a claim of ineffective assistance of counsel based on deficient voir dire absent a showing of actual bias.  Smith, 357 S.W.3d at 348 (citing Dellinger v. State, No. E2005-01485-CCA-R3-PD, 2007 WL 2428049, at *30 (Tenn. Crim. App. Aug. 28, 2007), aff'd, 279 S.W.3d 282 (Tenn. 2009)).

In denying relief based on this claim, the post-conviction court found that the Petitioner failed to present any proof of a systemic exclusion in the jury selection process. The court also found that the Petitioner failed to prove by clear and convincing evidence that there was an abridgement of a constitutional right in either the venire or the voir dire. The court specifically accredited the testimony of trial counsel that the Petitioner told counsel that he was white when directly asked.  It further noted that trial counsel questioned the prospective jurors regarding whether they would have trouble rendering a fair verdict in a case involving a brown, Hispanic defendant and a white female victim. The post-conviction court concluded that there was no evidence in the record that any juror was prejudiced or biased.

We have reviewed the trial transcript of the jury selection phase and agree with the post-conviction court that the Petitioner failed to demonstrate prejudice based upon the composition of the venire.  There was no evidence presented at the post-conviction hearing that the jury selection process in Smith County was unconstitutional.  Moreover, the Petitioner did not present proof that the outcome of trial would have been different if there were minorities in the impaneled jury.  Based on our review, we conclude that the record does not preponderate against the post-conviction court's finding that the Petitioner failed to establish either deficiency or prejudice in the jury selection process.

The Petitioner's assertion that trial counsel was ineffective for failing to request a change of venue also lacks merit.  A change in venue can be granted upon a showing of undue excitement or any other cause that is likely to result in an unfair trial.  See Tenn R. Crim. P.  21.  However, the failure to seek a change in venue will not establish ineffective assistance of counsel absent a showing of prejudice.  Adkins v. State, 911 S.W.2d. 334, 337 (Tenn. Crim. App. 1994).  Trial counsel testified that he did not believe there was a basis for a change of venue.  The record reflects that the prospective jurors were questioned about their knowledge of the Petitioner and the case, and the majority of them

indicated that they had no prior exposure. We note that the Petitioner has presented no evidence that the failure to seek a change of venue was prejudicial to his defense or that the trial court would have granted the request. Accordingly, we conclude that trial counsel was not ineffective for failing to challenge the racial composition of the venire or to request a change of venue.

**II. Motion to Suppress.** Next, the Petitioner argues that trial counsel should have filed a motion to suppress his statement to Agent Locke. He asserts that his statement was illegally obtained based on the violation of his Miranda rights and his right to counsel. The State responds that the post-conviction court properly determined that the issue was a matter of trial strategy and that the Petitioner voluntarily waived his rights prior to his interview.

With regard to the Petitioner's statement to law enforcement, the post-conviction court found that counsel made the strategic decision not to suppress a statement that he considered to be exculpatory. The court noted that the Petitioner had consistently stated that the victim's death was accidental during his testimony at trial and on the night of the interview. The court found counsel's decision to include the statement to be reasonable given that it was arguably helpful and supported the theory of the defense. The post-conviction court concluded that the Petitioner did not meet his burden of proof on this claim by clear and convincing evidence.

We conclude that the Petitioner has failed to prove that trial counsel's performance was deficient in this regard. Trial counsel testified that he represented the Petitioner from the time of his arrest to the motion for new trial hearing. He stated that the Petitioner consistently denied shooting the victim. Counsel said that there was never a question that the Petitioner would testify at trial because he needed to tell his side of the story. According to trial counsel, the Petitioner's statement to Agent Locke was consistent with the defense theory. Even after the Petitioner moved out of the state, he and counsel met multiple times to discuss the trial and the proof. Counsel believed that he had done everything he could in the Petitioner's case, and he did not recall the Petitioner ever complaining about the defense strategy. This court must be highly deferential to counsel's performance, Burns, 6 S.W.3d at 462, and we will not second-guess the informed tactical and strategic decisions of trial counsel. Pylant v. State, 263 S.W.3d 854, 874 (Tenn. 2008) (citing Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997)). Here, the record reflects that trial counsel adequately prepared for trial and made an informed strategic decision to include the Petitioner's prior consistent statement in the evidence. Moreover, "'[t]he fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation.'" House, 44 S.W.3d at 515 (quoting Goad, 938 S.W.2d at 369). The Petitioner has not established that trial counsel's conduct fell below "an objective standard of reasonableness under prevailing professional

-14-

norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Accordingly, he is not entitled to relief on this issue.[3]

**III.    Admission of the Sander.**    The Petitioner's next claim concerns the introduction of the sander into evidence at trial. In his brief, he argues that because trial counsel testified that he had no recollection regarding the sander, the post-conviction court improperly determined that counsel provided effective assistance on this issue. The State responds that despite counsel's lack of recollection of events occurring thirteen years before, it is incumbent upon the Petitioner to prove deficient performance and resulting prejudice. We conclude that the Petitioner has not established prejudice based on counsel's alleged deficiency.

At the post-conviction hearing, the Petitioner alleged that the sander was inadmissible as evidence at trial because it was seized from his neighbor's property, which exceeded the scope of the search warrant. He testified that this illegally obtained evidence was used at trial to support the State's allegation that he removed the serial numbers from the revolver that was found at the crime scene. Trial counsel testified that although he could not recall the sander, it was his usual practice to review the validity of search warrants. Agent Locke testified that he recovered a Milwaukee heavy duty sander as a result of the execution of a search warrant at the Petitioner's property on October 15, 1999. In rejecting this claim for relief, the post-conviction court noted in its oral findings that the search warrant specifically authorized the recovery of evidence of tools used to remove serial numbers. The court concluded that "there [wa]s no showing of prejudice in this case with regard to the lack of objections or suggestions with regard to suppression[.]"

We agree with the post-conviction court's conclusion that trial counsel was not ineffective in this regard. Specifically, the Petitioner has failed to present any proof or argument that but for counsel's failure to object to the admission of the sander, the outcome of the proceeding would have been different. We note that there were fifty exhibits introduced at trial, including the autopsy report which reflected that the cause of the victim's death was a gunshot wound inflicted when the barrel was pressed to her

---

[3] Because the Petitioner has made an insufficient showing of deficiency, we need not address the issue of prejudice. See Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697). Nevertheless, we note that the Petitioner failed to demonstrate prejudice from counsel's failure to file a motion to suppress his statement. The record reflects that the Petitioner signed a Miranda waiver prior to providing a statement to law enforcement. At the post-conviction hearing, the Petitioner acknowledged that the majority of his interview was conducted after he signed the waiver. Moreover, Agent Locke testified that the Petitioner was cooperative and voluntarily provided information during the interview. Therefore, the Petitioner has not established a reasonable probability that the motion to suppress would have been successful.

-15-

head. The physical evidence also established that the victim was shot with a 9 mm pistol, a weapon which the Petitioner admittedly possessed. Ownership of the .38 caliber revolver could not be determined because the serial number had been removed. The State further built its case against the Petitioner by introducing evidence of the bitter divorce proceedings between the spouses, the fact that the victim reported the Petitioner's theft to police in August 1999, and proof that the victim was awarded custody of the couple's son shortly before her death. On direct examination, trial counsel asked the Petitioner about the sander, and the Petitioner responded that he had borrowed the tool from a friend who lived in Ashland City. The Petitioner denied using the sander to remove the serial number from the .38 revolver. In sum, given the overwhelming evidence of guilt and the Petitioner's admission that he possessed the sander, the Petitioner has failed to show that he was prejudiced by counsel's decision not to object to the evidence. Therefore, this claim is without merit.

**IV. Failure to Call Witnesses.** The Petitioner also argues that trial counsel was ineffective for failing to subpoena Detective Danny Williams to testify at trial and for failing to re-examine TBI Special Agent Roy Copeland. According to the Petitioner, Detective Williams "played a major role in the investigation of [his] case" and should have been called as a witness. He asserts that members of law enforcement could have testified regarding how they processed the crime scene, including the collection of fingerprints and the photographs taken at the scene. The State responds that the Petitioner failed to prove either deficiency or prejudice.

Regarding trial counsel's failure to call several witnesses, the post-conviction court concluded that counsel's performance was not deficient. The court noted that counsel had practiced law for over thirty years and had experience with numerous murder trials. The court accredited trial counsel's testimony regarding his thorough pretrial preparation, his review of discovery materials, and his method of preparing a detailed trial notebook. The post-conviction court found that counsel was "well prepared" and had made tactical decisions regarding witnesses. With regard to the examination of witnesses, the court noted that counsel made reasonable decisions and questioned witnesses consistently with the defense theory instead of asking everything that the Petitioner wanted.

The record does not preponderate against the post-conviction court's findings on this issue. At the evidentiary hearing, trial counsel testified extensively regarding his preparation both before and during trial. He said that it was his practice to confer with clients about which witnesses to call and the questions to ask. Counsel said that he did not call witnesses if their testimony would harm the defense. He did not recall the Petitioner ever complaining about the witnesses who were interviewed and subpoenaed. We conclude that trial counsel adequately prepared for trial and made tactical decisions

-16-

regarding witnesses. Moreover, the Petitioner did not call Detective Williams or Agent Copeland to testify at the evidentiary hearing. To prevail on an ineffective assistance of counsel claim based upon counsel's failure to call a witness at trial, the Petitioner must present that witness at the post-conviction hearing. Black v. State, 749 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "'As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.'" Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (quoting Black, 794 S.W.2d at 757). Accordingly, the Petitioner has failed to meet his burden of proof in establishing his claim, and he is not entitled to relief.

**V. Failure to Introduce Tape Recorder.** Next, the Petitioner contends that counsel erred in "not asking about or seeking to introduce a tape player" at trial. In his second amended petition, the Petitioner alleges that trial counsel "abandoned all questioning of T.B.I. Agent Jason Locke regarding the audiotape that was playing at the time the victim arrived at the Petitioner's residence." The State argues that there is no evidence of prejudice in this claim.

In dismissing this ground for relief, the post-conviction court stated as follows:

> Mr. Medina, in his petition, says, well, there was a tape recording of these events. Nothing was taken the night of this event. Photographs were taken. Later on, nothing on the return shows a cassette recording. I wonder as I see this on this Officer's return and the inventory, I wonder, well, when Mr. Medina returned to the residence, it must still have been there in the house. There's no suggestion -- and where is the prejudice here?

> Again, the test is also has he been prejudiced by all of this lack of effective assistance of counsel. There's no showing on those particular issues.

We agree with the post-conviction court that the Petitioner has failed to demonstrate prejudice arising from counsel's performance in this regard. At the evidentiary hearing, Agent Locke testified that the State never collected a tape recorder or cassette tape on the night of the shooting or after executing the search warrant later in October 1999. Agent Locke said that there was no evidentiary value in the device since it was photographed but not seized. The Petitioner testified consistently at trial and at the post-conviction hearing that on the evening of the shooting, he turned off the tape recorder after his wife became angry. Therefore, the Petitioner's own testimony supports the conclusion that there was no value in this evidence. Accordingly, he has not established a reasonable probability that but for counsel's alleged errors regarding the

-17-

tape recorder, the outcome of the proceeding would have been different. This issue lacks merit.

**VI.   Allegation of Planted Evidence.**   The Petitioner further asserts that trial counsel failed to question witnesses about a towel that he believed had been planted next to his wife's body by law enforcement. The Petitioner bases his claim on the fact that two diagrams of the crime scene submitted by EMT Mark Manning and TBI Special Agent Roy Copeland did not depict a towel in the area. However, crime scene photographs showed a towel next to the victim. The State responds that the post-conviction court examined the exhibits and properly concluded that the diagrams were merely illustrative and that there was no evidence of prejudice.

At the post-conviction hearing, the Petitioner maintained that law enforcement placed a towel next to the victim's body to bolster the theory that the Petitioner had wiped the fingerprints off the weapons. However, the Petitioner conceded that EMT Mark Manning testified that photographs were more accurate because his diagram did not include everything that was at the crime scene. At trial, Manning stated that his diagram "was just a real quick sketch" and that it was not meant to have evidentiary value. In dismissing this claim, the post-conviction court found that the State had adequately explained the discrepancy between the diagrams and the photographs. The court noted that there were other items which were depicted in one exhibit but left out of the other. The court found no proof of prejudice based on counsel's failure to ask about the lack of a towel in the diagrams. We conclude that the record does not preponderate against the post-conviction court's findings, and the Petitioner is not entitled to relief on this claim.

**VII.   Failure to Object to Gaps in 911 Recording.**   The Petitioner contends that trial counsel should have objected to or addressed the gaps in the 911 recording. He argues that the issue "could have been confusing to the jury" and that the State's explanation at the post-conviction hearing "d[id] not repair the possible prejudice to the [Petitioner] at trial." The State responds that the Petitioner presented no proof of exculpatory evidence in the recording and therefore failed to establish prejudice.

At the post-conviction hearing, the Petitioner alleged that the recording of his 911 call had been altered to support the State's theory that he had staged the crime scene. Trial counsel testified that he had listened to the recording multiple times and could not recall any gaps in the tape. Agent Locke explained that 911 recordings typically included pauses because calls were recorded on separate tracks, and dispatchers often respond to many events at the same time. The post-conviction court found no prejudice or evidence to support the Petitioner's allegation that the tape had been altered:

The 911 tape, in this courtroom here today, I think it was clearly explained why there could be a gap, and indeed, what's the prejudice? Is there something that Mr. Medina said that has been missing on this particular tape? I heard him say nothing to that extent, that he said something or other people said something that was exculpatory or that would help him in some form or fashion. There's been no proof in the record that this gap in the tape contains something that he said; there's been no proof that he has produced here to show clearly and convincingly that [trial counsel] was inadequate in his representation because of certain missing contents, and I think the State has adequately explained, if you want to even call it a gap to that tape.

We agree with the post-conviction court that the Petitioner has failed to show that trial counsel was ineffective regarding the 911 recording. Specifically, the Petitioner has not demonstrated how he was prejudiced by counsel's failure to object to the gaps in the tape. Apart from his allegation that the 911 recording was altered and did not record the entire event, the Petitioner failed to support his claim with any evidence. At the post-conviction hearing, he did not present any proof to establish a reasonable probability that counsel's objections to the recording would have resulted in a different outcome. Accordingly, the Petitioner is not entitled to relief on this issue.

**VIII. <u>Self-Defense Instruction.</u>** Finally, the Petitioner argues that trial counsel was ineffective for failing to object to the trial court giving a jury instruction on self-defense. In his second amended petition, the Petitioner contends that counsel was aware that he had never relied on a defense of self-defense and that he had always denied firing a weapon. The State responds that the proof presented at trial warranted a self-defense instruction and therefore counsel was not ineffective in this regard.

It is well-settled that a criminal defendant is entitled to an instruction on every issue raised by the evidence. <u>See</u> <u>Myers v. State</u>, 185 Tenn. 264, 206 S.W.2d 30, 31-32 (Tenn. 1947) (holding that a defendant is entitled to an affirmative instruction on self-defense if raised by the evidence). A trial court is obligated to give the jury a complete charge on the law applicable to the facts of the case, and a failure to do so may constitute reversible error even where a defendant has not requested the instruction. <u>See</u> <u>Poe v. State</u>, 212 Tenn. 413, 370 S.W.2d 488, 489 (Tenn. 1963). Significantly, a self-defense instruction may be charged even where a defendant claimed that the homicide was an accident. <u>See</u> <u>Myers</u>, 185 Tenn. at 268, 206 S.W.2d at 31 (citing <u>State v. Stevens</u>, 96 Mo. 637, 10 S.W. 172 (Mo. 1888)). "The issue of the existence of a defense is not submitted to the jury unless it is fairly raised by the proof." T.C.A. § 39-11-203(c).

At the time of the Petitioner's offense, the self-defense statute provided, in pertinent part:

A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

T.C.A § 39-11-611(a) (1999). At trial, the Petitioner testified that the victim was armed with a revolver on the day of the shooting. He stated that he became scared after he saw the weapon hidden in the sofa, and he retrieved his gun from the bedroom safe. He said he was afraid and did not know what to do when the victim started losing control. According to the Petitioner, the victim aimed the revolver at him while he was holding their son. At one point, the Petitioner testified that the victim "grabbed the gun and [he] could see it in her face she was going to shoot [him]." He said that he grabbed the victim and pushed her, and they fell to the ground with their son. The Petitioner called 911 after the victim did not get up.

The trial transcript reflects that during a discussion about the jury charge, the trial court raised the issue of self-defense over the objection of the State. The State argued that the Petitioner never claimed self-defense and had testified that he never removed his weapon from his back pocket. Trial counsel argued that the self-defense charge should be submitted for the jury's consideration. The trial court reasoned as follows regarding this jury instruction:

You don't plead not guilty by reason of self-defense. You just plead not guilty and let the case set all the facts. And here we have a person assaulted, or using force, for someone to create in that person's mind a reasonable belief that they're in imminent or actual danger then that person is justified in doing certain things, that's what the charge says. I think it follows, from what was said about getting the gun, putting it in his pocket, why he did it, that type of thing - - I'm not saying the jury is going to buy it, I'm not saying I'd buy it, but I'm saying theoretically under the law all of that is applied. And I believe if I don't charge it, I think it would be error, . . . and it would have to be tried again even if he got a conviction.

With respect to this claim, the post-conviction court determined that the evidence at trial raised an inference that the Petitioner had feared for his life. The court noted that every trial judge is obligated, even if reluctantly, to instruct the jury based on issues raised in the proof. The post-conviction court concluded that it would have been error for the trial court not to provide the self-defense jury instruction given the evidence presented at trial.

We conclude that the Petitioner has failed to establish either deficiency or prejudice arising therefrom based on the self-defense instruction. The trial court, finding the issue of self-defense had been fairly raised, instructed the jury on this theory. The jury heard the Petitioner's testimony that the shooting was accidental and, by its verdict, did not credit the Petitioner's testimony or that he had acted in self-defense. The Petitioner has not proven by clear and convincing evidence that counsel was deficient in not objecting to the self-defense charge. Moreover, the Petitioner has not presented any evidence of prejudice based on this alleged deficiency. We discern no reasonable probability that the jury verdict would have been different if the jury had not been instructed regarding self-defense. This issue is without merit.

## CONCLUSION

After a thorough review of the record, we cannot conclude that the results of the Petitioner's trial were undermined or that the proceedings were fundamentally unfair because of the alleged errors of counsel. See Strickland, 466 U.S. at 670 ("[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged."). The Petitioner is not entitled to post-conviction relief, and the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE

-21-